IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| PENELOPY L. STEVER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-3037-CV-S-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION REVERSING COMMISSIONER'S FINAL DECISION AND REMANDING FOR FURTHER PROCEEDINGS

Saying this case has had a tortured history is a supreme understatement. Plaintiff filed her claim for benefits in October 2001, alleging an onset date of June 23 2001. She had a hearing before an ALJ in June 2003 and a supplemental hearing in October 2003, followed by a denial of her claim in February 2004. In May 2004 the Appeals Council vacated the decision and remanded to the ALJ for another hearing. The rehearing was held in November 2004 and a supplemental hearing was held in April 2005, followed by a second denial of her claim in February 2006. In November 2006, the Appeals Council again vacated the decision and remanded for another hearing, which was held in September 2008. Her claim was denied in December 2008, and the Appeals Council affirmed the denial in November 2009. Plaintiff filed this suit in January 2010, but in October of that year the Commissioner requested a "sentence 6" remand because the December 2008 decision and related transcript could not be located. The Court granted the request to remand and further directed that "[i]f the Commissioner is unable to find the missing materials within ninety days, a de novo hearing must be held."

Apparently, the materials could not be located. In March 2011, the Appeals Council vacated the denial of benefits and remanded for a new hearing. The new

hearing was held in July 2011, and the ALJ denied Plaintiff's claim in August 2011. The August 2011 denial stands as the Commissioner's final decision in this matter.

Whatever one may think of this history, it does not alter the standard of review. While the Court does not wish to unnecessarily prolong the proceedings, the Court is persuaded that the proper course is to reverse the Commissioner's final decision and remand for further proceedings.

## I.  BACKGROUND

Plaintiff was born in July 1970, has a GED, completed some college classes, and has no relevant work experience. Following an auto accident, Plaintiff underwent an MRI of her back on June 25, 2001 – two days after her alleged onset date. The MRI revealed "normal alignment of the vertebral bodies and normal prevertebral soft tissues. No evidence of fracture or subluxation is seen." R. at 120. The MRI also revealed "[m]ild decrease in disc space . . . at L5-S1 consistent with degenerative disc disease [but] [t]he vertebral body height, vertebral disc spaces and posterior vertebral elements are normal." R. at 121. A medical examination performed by her doctor at the time, Dr. Ricardo Martinez, revealed tenderness and other after-effects from the accident, but within days Plaintiff reported the pain was diminishing. R. at 158-64. On June 29, Plaintiff reported no pain other than a "light migraine," R. at 156, but within a week reported that her back pain returned. R. at 152, 154. On and after July 6, Plaintiff reported nothing worse than "mild pain" that she rated at a 3 to 4 on a 1-10 scale. R. at 138-48. On July 20, she reported severe pain in her lower back and legs after being on her feet for too long, R. at 136, but three days later this pain had subsided and Plaintiff was relatively pain-free through the end of July. R. at 128-34. Plaintiff returned to Dr. Martinez on September 14, complaining of moderate to severe pain in her lower back, severe pain in her legs, and moderate pain in her neck (which she attributed to a migraine). R. at 124. Plaintiff made a similar complaint on September 24, which appears to be her last visit to Dr. Martinez. R. at 122.

Plaintiff underwent a consultative mental examination in February 2002. Her daily activities were normal. Plaintiff reported that she had no difficulty working as a

2

cafeteria worker (her sole prior job at the time), but had difficulties with concentration and memory. The examiner indicated Plaintiff exhibited traits consistent with PTSD (due to abuse suffered as a child) and suffered from caffeine abuse. Plaintiff's GAF score was 55 currently, 65 in the past year. The examiner concluded Plaintiff's prognosis was "guarded," that she might benefit from medication, and that she appeared to have "intellectual deficits." R. at 168-71.

In February 2002, Plaintiff also underwent a consultative physical examination, at which time she reported pain in her lower back and frequent migraines. An x-ray of her spine was unremarkable. She complained of pain during tests on her legs. The examiner opined that Plaintiff "needs to be under medical supervision by her primary care physician for her various medical problems as described above." However, the examiner did not offer any diagnoses or suggest any particular limitations on Plaintiff's functional capacity. R. at 173-75. However, a functional capacity assessment completed by a non-examining consultant from the Disability Determination Section ("DDS") indicated Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand for six hours a day, and sit for six hours a day. R. at 177-84. A Psychiatric Review Technique Form ("PERT") was completed by a non-examining DDS physician, reflecting that Plaintiff suffered mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. at 185-98. The same doctor who completed the PERT also provided a Mental Residual Functional Capacity Assessment, which indicated Plaintiff was moderately limited in a variety of areas, including her ability to: understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, maintain regular attendance or adhere to a schedule, work with others without distraction, accept instruction and criticism, or interact appropriately with the general public. R. at 199-202.

Plaintiff began receiving treatment from Dr. Jackson Chen for migraine headaches and back pain in June 2002.[1] She was initially treated with Felexeril, R. at 222, but in July 2002 was also prescribed Tylenol #3. R. at 220. In February 2003,

---

[1] Not all of Plaintiff's visits to Dr. Chen were for treatment of these conditions. E.g., R. at 213 (treatment for stepping on a nail).

3

Plaintiff reported that her back pain was "better lately." R. at 212. In April 2003, Dr. Chen prescribed Depakote. R. at 209. In July 2003, Plaintiff related that she had done well previously on Maxalt (a medication for migraines), and Dr. Chen provided a prescription. On August 4, 2003, Plaintiff "called to say Maxalt [was] working well." R. at 208.

Dr. Chen's treatment notes are relatively sparse and do not reflect Plaintiff registered the same complaints that she makes in this proceeding. Nonetheless, on July 14, 2003, Dr. Chen completed a questionnaire regarding Plaintiff's work-related activities. Dr. Chen's answers indicated Plaintiff could lift less than ten pounds, stand or walk for two hours a day, stand for no more than ten minutes at a time, walk for no more than five minutes at a time, sit for three hours a day and no more than thirty minutes at a time, and needed the opportunity to "lie down at unpredictable intervals" at least twice a day, and be absent from work at least once a month. The questionnaire advised that the person completing the form should "relate particular findings to any reduction in capacity" and identify medical findings (such as examination findings, x-rays, and other test results), but none are provided – and, as noted, none appear in Dr. Chen's treatment notes. The questionnaire also does not indicate the length of time these limitations could be expected to last, which is significant because Dr. Chen indicates Plaintiff's limitations are due to a combination of chronic back pain, a small avulsion fracture, and an ankle sprain. R. at 224-26. The opinion does not indicate the extent to which it depends on Plaintiff's sprained ankle, and any associated limitations could not be expected to last more than a year.

This represented the state of the Record at the time of the ALJ's first decision. As noted earlier the decision was vacated by the Appeals Council, primarily so the Record could be developed further as related to Plaintiff's anxiety. R. at 248-50. Accordingly, in December 2004 Plaintiff underwent a consultative mental examination performed by a psychologist, Dr. Christopher Klaas. Dr. Klaas offered opinions about Plaintiff's physical capabilities, but as Dr. Klaas is a psychologist and not a medical doctor those opinions are not entitled to deference and need not be discussed. Dr. Klaas also indicated Plaintiff exhibited "elevated anxiety, ruminative worry and neurotic level depression," and assessed her GAF score at 65. Interestingly, Plaintiff's

4

description of her daily activities did not suggest any limitations on her abilities. R. at 228-32. Dr. Klaas also completed a Medical Source Statement – Mental in which he indicated Plaintiff was markedly limited in her ability to respond appropriately to changes and pressure in a work setting. In all other areas, Dr. Klaas indicated opined that Plaintiff had slight or no impairments. R. at 233-35.

On April 30, 2005, Plaintiff was transported to the hospital by ambulance, complaining of severe back pain and numbness in her legs. She was prescribed Flexeril and was instructed not to do any bending, lifting, or driving for two weeks. R. at 456-69.

In October 2006 Plaintiff went to St. John's Physicians and Clinics ("St. John's Clinic") to establish care, where she began seeing Dr. Audrey Gordin. She was diagnosed as suffering from migraine headaches, PTSD, insomnia and chronic back pain, and directed Plaintiff to continue taking the medications she had been prescribed (Darvocet and Maxalt). R. at 489-90.

This was the state of the Record in November 2006, when the Appeals Council remanded the case for a second time. On this occasion, the Appeals Council remanded because the ALJ determined Plaintiff could return to her past relevant work as a cafeteria worker, fast food worker or telemarketer, but it was "unclear form the record whether the claimant's past work can be considered past relevant work." In addition, the ALJ was directed to further consider Plaintiff's mental impairments. R. at 538-39.

Plaintiff returned to St. John's Clinic in April 2007. The Record reflects this was Plaintiff's first visit since her initial one in October 2006. On this occasion Plaintiff complained of chest pain, which the doctor attributed to stress related to Plaintiff's financial difficulties and which was treated as a panic attack. R. at 488. Approximately ten days later Plaintiff's symptoms were resolved. R. at 487. Plaintiff next went to St. John's Clinic in February 2008, complaining of severe headaches. She reported taking Fioricet, which had been effective although the effectiveness had diminished lately. Doctor Gordin suspected Plaintiff's increased headaches were due to anxiety and suggested she take an antidepressant, but Plaintiff "was resistant to trying one." Plaintiff's Fioricet was replaced with Depakote. R. at 486. In September 2008, Dr. Gordin completed a questionnaire indicating Plaintiff suffers from migraines

5

approximately once a week. The questionnaire confirms Plaintiff's report that the migraines could last as long as three days and required her to lie down in a quiet place to cope. However, Dr. Gordin declined to state that Plaintiff's self-described symptoms were consistent with her medical condition, and instead reported that she had "told patient that I would need to review her old records and do a workup to evaluate cause of her headaches." Dr. Gordin also stated that Plaintiff's PTSD, anxiety and depression might be a cause of the headaches, but that Plaintiff was not complying with the recommended treatment for those conditions. R.at 498-99.

In October 2008, Plaintiff underwent a consultative medical exam performed by Dr. Charles Ash. Dr. Ash completed a Medical Source Statement – Physical that he cautioned was "based strictly on objective findings. Based on subjective findings, she has considerably more restriction." That statement reflected Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand or walk six hours in an eight hour day, sit for unlimited periods of time, and could only occasionally climb, balance, kneel, crouch, crawl or stoop. R. at 510-15.

That same month Plaintiff underwent a consultative mental examination conducted by psychologist Brooke Whisenhunt. Dr. Whisenhunt opined that Plaintiff suffered from pain disorder and anxiety disorder, could understand and remember simple instructions, sustain concentration and persistence on easy tasks, interact "in at least moderately demanding social situations, and could adapt to her environment. She assessed Plaintiff's GAF score at 55.

In August 2009, Plaintiff returned to St. John's Clinic for refill of medications. The physician's notes indicate Plaintiff had been "to the headache clinic" where she was told her headaches were stress induced – but Plaintiff indicated she could not reduce her stress because it was caused by her children and husband. Plaintiff also reported that she had stopped taking Depakote because it was expensive. R. at 739.

In October 2009, Plaintiff underwent another consultative examination, this time performed by Dr. Yung Hwang. Despite Plaintiff's complaint of lower back and extremity pain and numbness, she was observed to walk normally. Examination of her upper extremities and lower was normal and she showed a normal range of motion in her neck. Dr. Hwang indicated Plaintiff had degenerative disk disease, a possible

6

bulging disc at L4-5 with minor symptoms, and cervical neuropathy and headaches secondary to arthritis in her neck. He opined that Plaintiff could work "with minimal labor as long as headaches and back pain are controlled with medications." R. at 748-50.

At the July 2011 hearing, Plaintiff testified that she took Maxalt as needed – approximately once a week to once a month – but that it "knocks you out cold" for up to four hours. R. at 828-29. She also took Amitriptyline, which made her dizzy and disoriented – but she only took that medication at night to help her sleep. R. at 829. Plaintiff also testified that she could carry ten pounds regularly, walk no more than five minutes, stand for five to ten minutes, and sit for fifteen minutes. Engaging in these activities for a longer period of time made her "go numb" in her lower back and legs. R. at 831-32. While her teenaged sons and husband did some of the chores, Plaintiff did not indicate any of her daily activities were limited (although she does take a one or two hour nap during the day). R. at 835-37. However, she does not engage in these activities when she is experiencing a migraine. R. at 841.

A medical expert, Dr. Anne Winkler, testified at the hearing and confirmed that Plaintiff's medical records demonstrate a history of low back pain and "headaches that have not been well defined" so she could not characterize their type. R. at 844. Based on those records, Dr. Winkler opined that from October 15, 2001, through the date of the hearing, Plaintiff was able to lift fifty pounds occasionally and twenty pounds frequently, stand or walk for six hours a day, and sit for unlimited periods of time. R. at 845-46. Upon further questioning about Plaintiff's headaches, Dr. Winkler explained that she did not doubt that Plaintiff had headaches, but she was not able to ascertain whether they were musculo/skeletal or migraine. Dr. Winkler also noted that various measures had been suggested (such as stopping her use of contraceptives and caffeine). R. at 847. Dr. Winkler also testified that Maxalt is typically used to avert a headache at its onset and does not typically have a side effect of the nature and severity described by Plaintiff. R. at 849.

A vocational expert ("VE") testified in response to hypothetical questions. She was first asked to assume a person of Plaintiff's age, education and work experience who was limited in a manner consistent with Dr. Winkler's opinion and who also could

7

have no more than occasional interaction with the public, co-workers, or supervisors. The VE testififed such a person could perform medium, unskilled work such as a hand packager or a production welder. R. at 853. The second hypothetical changed the first to a person who was limited in a manner consistent with Dr. Ash's October 2008 opinion; the VE testified that such a person could perform light work such as production assembler or an office helper. The third hypothetical assumed a person of Plaintiff's age, education and experience who could lift or carry less than ten pounds occasionally and frequently, stand or walk for two hours a day and for ten or fifteen minutes at a time, sit for thirty minutes at a time and no more than three hours per day, and would be limited to simple tasks and instructions an no more than occasional interaction with other people. The VE testified that such a person could not perform work in the national economy. R. at 835-36. The fourth hypothetical a claimant of Plaintiff's age, education and experience who would miss three days of work per month due to headaches; the VE testified such a person could not maintain employment. R. at 836.

The ALJ found Plaintiff was limited in the manner described in his first hypothetical posed to the VE. Based on the VE's testimony, the ALJ found Plaintiff was not disabled.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might

8

accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

## A. Failure to Defer to Dr. Chen's Opinion[2]

Plaintiff first faults the ALJ for failing to defer to Dr. Chen's July 2003 opinion. In presenting this argument, Plaintiff characterizes Dr. Chen as a treating physician to whom deference was owed. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Anderson v. Astrue, 696 F.3d 790, 793-94 (8th Cir. 2012); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). The ALJ noted Dr. Chen's statement, but also noted – correctly – that it was "not supported by treatment notes or by the results of clinical or diagnostic testing . . . . Dr. Chen has not submitted any reports that would reveal the type of significant clinical abnormalities one would expect if the claimant were in fact as limited as assessed in his" statement. R. at 23. Plaintiff contends that a doctor's treatment notes are not RFC evaluations – but this does not address the stark contrast between Dr. Chen's treatment notes and Dr. Chen's medical source statement. An abundant number of cases (two of which are cited above) confirm that such inconsistencies justify an ALJ's decision not to defer to a treating physician.[3]

## B. Plaintiff's Mental Impairments

Plaintiff does not suggest the ALJ's findings and conclusions regarding Plaintiff's mental capabilities are not supported by substantial evidence in the Record as a whole. Instead, she faults the ALJ for not relying on the February 2002 consultative psychiatric

---

[2]Plaintiff presents other arguments under this heading that the Court believes are more appropriately addressed with Plaintiff's challenges to the ALJ's determination of Plaintiff's residual functional capacity.

[3]It should also be noted that Dr. Chen's opinion seems to differ from Dr. Gordin's opinion – and Dr. Gordin is also a treating physician.

9

examination performed by Dr. Karen Kinney. Plaintiff's argument is, essentially, that the ALJ should not have relied on any of the other consultants and instead should have relied on the 2002 consulting opinion. Plaintiff offers no argument that legally compels such a course. The ALJ evaluated the evidence, and Plaintiff's analysis represents a different – but not mandated – view of the evidence.

The Court is not even convinced the 2002 opinion is markedly different from later reports. In particular, the Court notes the 2002 opinion indicated Plaintiff's present GAF was 55 but her highest in the past year was 65. The consultant also indicated Plaintiff might benefit from medication – medication that Dr. Gordin also suggested, but that Plaintiff rejected. Even the opinion that Plaintiff suffered from borderline intellectual functioning was not certain, as the consultant indicated further testing was required.

### C. Assessment of Plaintiff's Credibility

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work

10

> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

The ALJ rejected Plaintiff's testimony regarding her headaches for a variety of reasons. First, Plaintiff failed to follow doctors' advice regarding treatment. Plaintiff emphasizes that none of the steps advised by doctors (reducing stress, avoiding caffeine, and so forth) were guaranteed to eliminate or reduce or headaches. Plaintiff's argument misses the point. A factfinder is permitted to presume that a person experiencing debilitating pain will follow a doctor's advice in an attempt to avoid the pain. Conversely, a factfinder may conclude a person's failure to follow a doctor's advice indicates the pain is not as serious as claimed. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005); see also Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010). Plaintiff also attempts to excuse her noncompliance, contending her noncompliance was caused by her PTSD. While a mentally ill claimant's noncompliance can be the result of mental illness; cf. Pates-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009), nothing in *this* Record suggests *this* claimant's noncompliance was the result of mental illness. To the contrary, the ALJ found Plaintiff had only minimal limitations on her activities of daily living, and according

to Plaintiff's testimony most of those limitations arose from her physical, not her mental, condition. R. at 20.

Second, Plaintiff's daily activities did not suggest the limitations she testified to during the hearing. Plaintiff argues that the ability to conduct ordinary domestic activities is not inconsistent with a finding of disability. While true, the ability to conduct ordinary domestic activities is inconsistent with the specific limitations Plaintiff claimed during her testimony.

While not specifically addressed by Plaintiff, the Court notes additional factors cited by the ALJ that supported his credibility determination. First, Dr. Gordin's records do not reflect Plaintiff complained about headaches with the severity and frequency she described during the hearing. Second, Dr. Gordin's records reflect that Plaintiff's headaches were controlled with Maxalt; indeed, Plaintiff's statements to Dr Gordin (and other doctors) confirms this fact. During the hearing, Plaintiff testified that Maxalt caused her to sleep for as much as four hours – but (1) Plaintiff never reported this fact to any of her doctors and (2) there was evidence that this is not a common side effect of Maxalt.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Vossen v. Astrue, 612 F.3d 1011, 1017 (8th Cir. 2010) (quotation omitted). In this case there are competing factors, some of which favor Plaintiff's credibility and some of which undercut it. The ALJ's resolution of these conflicts is supported by substantial evidence in the Record as a whole and must be affirmed.

### D. Plaintiff's RFC

The RFC found to exist is essentially a combination of Dr. Ash's and Dr. Winkler's opinions. Critically, the lifting limitations are those offered by Dr. Winkler, and therein lies the problem. Dr. Winkler did not examine Plaintiff. All Dr. Winkler could do was offer opinions based on the medical records – but none of those records suggest Plaintiff can lift fifty pounds occasionally and twenty pounds regularly. Dr. Winkler's opinion lacks an acceptable basis.

While "a claimant's RFC is a medical question, . . . in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). A claimant's RFC need not be proved *only* with medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam). However, there is a significant amount of medical evidence suggesting Pliantiff is more limited than described by Dr. Winkler, and no evidence – medical or otherwise – to support Dr. Winkler's opinion.

As stated earlier, the Court does not relish contributing to further delay in this case's ultimate outcome, particularly given the Court's strong suspicion that Plaintiff retains the functional capacity to perform work at an exertional level below medium. Nonetheless, the Court cannot determine how limited Plaintiff really is: this is an issue for the ALJ to resolve. All the Court can say is that the Record does not support a conclusion that Plaintiff could perform medium-level work, so the case must be remanded for reconsideration.

### III.  CONCLUSION

The Commissioner's final decision is reversed and the case is remanded for further proceedings consistent with this Order and Opinion.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: November 26, 2012                UNITED STATES DISTRICT COURT